Elliot Gale (Bar #263326)
egale@gajplaw.com
Joe Angelo (Bar #268542)
jangelo@gajplaw.com
Gale, Angelo, Johnson, & Pruett, P.C.
1430 Blue Oaks Blvd., Ste. 250
Roseville, CA 95747
916-290-7778 ph
916-721-2767 fax

Attorneys for Plaintiff
Luis Arce

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

LUIS ARCE

Plaintiff,

v.

EQUIFAX INFORMATION SERVICES, LLC; WHEELS FINANCIAL GROUP, LLC

Defendants.

CASE NO. 2:21-cv-03799

COMPLAINT FOR DAMAGES:

1. Violation of Fair Credit Reporting Act
2. Violation of California Consumer Credit Reporting Agencies Act
3. Breach of Contract

COMES NOW Plaintiff Luis Arce, an individual, based on information and belief, to allege as follows:

**INTRODUCTION**

1. This case arises under the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b), 15 U.S.C. § 1681e(b), 15 U.S.C. § 1681i(a)(2)(A)), 15 U.S.C. §

1681i(a)(4)), 15 U.S.C. §1681i(a)(5)(A)), and the California Consumer Credit Reporting Agencies Act, California Civil Code §1785.25(a).

2. Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendant in connection with his inaccurate, misleading, or incomplete reporting of Plaintiff's general unsecured account with Wheels Financial Group, LLC (hereinafter "Wheels Financial").
3. Defendant Wheels Financial continues to report Plaintiff's account as being past-due rather than reporting the account as included/discharged in bankruptcy and/or settled.
4. Such reporting is misleading and adversely impacts Plaintiff's credit worthiness.
5. Plaintiff's credit reports have been disseminated to third parties since the completion of his Chapter 7 bankruptcy.
6. Plaintiff's credit has also been damaged as a result of the inaccurate and misleading reporting.
7. Plaintiff has been denied various unsecured credit cards as a result of the Wheels Financial account tradeline.
8. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system.
9. Creditors know that by deviating from recognized credit reporting standards consumers will have difficulty raising their credit scores and improving their credit worthiness

## JURISDICTION & VENUE

10. Plaintiff re-alleges and incorporates herein by reference the allegations in each and every paragraph above, fully set forth herein.

11. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and 1367, and 15 U.S.C. § 1681

12. This venue is proper pursuant to 28 U.S.C. §1391(b)(1).

## GENERAL ALLEGATIONS

13. Plaintiff alleges that each and every Defendant is familiar with credit reporting industry standards and subscribes thereto.

14. Plaintiff alleges that each and every Defendant understands that deviation from credit reporting industry standards can and often does result in denial of credit, higher interest rates, and prompts those making credit decisions to draw a more negative inference from the reported data than if the Defendant reported in accordance with the recognized industry standard.

15. Plaintiff alleges that all actions alleged herein by Defendants were done knowingly, intentionally, and in reckless disregard for credit reporting industry standards in an attempt to purposefully undermine Plaintiff's attempt to improve their FICO Score.

16. In the alternative Plaintiff alleges that each and every Defendants actions were the result of reckless policies and procedures that inevitably led to inaccurate, misleading, or incomplete credit reporting.

### FICO, Inc.

17. FICO is a leading analytics software company with its principal headquarters located in San Jose California. FICO has over 130 patents related to their analytics and decision management technology, and regularly uses mathematical algorithms to predict consumer behavior including credit risk.

18. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent of lending decisions.

19. A FICO score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

20. Base FICO Scores range from 300 to 850, while industry-specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

21. Different lenders use different versions of FICO Scores when evaluating a consumer's credit worthiness.

22. There are 28 FICO Scores that are commonly used by lenders.

23. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies (CRAs).

24. The three largest CRAs are Experian Information Solutions, Inc.; Equifax, Inc. and Transunion, LLC.

25. FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models or algorithms are based on the premise that information provided by the CRAs is accurate and complies with credit reporting industry standards.

26. There are five key factors that a FICO Score considers: 1) Payment History, 2) Amount of Debt, 3) Length of Credit History 4) New Credit and 5) Credit Mix.

27. Each of the five factors is weighted differently by FICO.

28. 35% of a consumer's FICO Score relates to payment history, 30% relates to the amount of debt, 15% relates to the length of credit history, 10% relates to new credit, and the last 10% relates to a consumer's credit mix or the different types of debts reported.

29. Payment history refers to whether a consumer has paid their bills in the past, on time, late or missed payments. The more severe, recent, and frequent the late payment information, the greater the impact on a FICO

Score. Public record items such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

30. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

31. Once a delinquent account has been remedied the longer the account stays current the more a consumer's FICO Score should increase.

32. FICO Scores are entirely dependent upon information provided by data furnishers (DFs) to CRAs.

**e-OSCAR**

33. E-OSCAR is the web-based Metro 2 compliant system developed by Experian Information Solutions, Inc.; Equifax Information Services, LLC; TransUnion, LLC and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

34. When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification (ACDV) via e-Oscar to the DF.

35. The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g. "Account Type" "07" (07 in Metro 2 refers to a Charge Account).

**Metro 2**

36. The Consumer Data Industry Association is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening and collection service industries.

37. The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by the CDIA in an effort to universally report debts in a particular manner that is understood to be the most accurate way in which to report a

debt. Specifically, Metro 2 format was designed to allow reporting of the most accurate and complete information on consumer's credit history.

38. The CDIA's Metro 2 format is the credit reporting industry standard for accurate credit reporting.

39. The credit reporting industry at large depends upon Metro 2 and the CDIA's recommendations for reporting debt accurately.

40. The CDIA is *the* expert on accurate credit reporting. In support of her allegations Plaintiff avers the following:

   a. The CDIA offers a FCRA certificate program for all CRAs.
   b. The CDIA offers a FCRA awareness program for all CRAs.
   c. The CDIA offers a FCRA Certificate program for DFs.
   d. The CDIA offers a FCRA awareness program for DFs.
   e. The CDIA offers a Metro 2 Learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 Format as well as the relationship between multiple fields.
   f. The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and Transunion.
   g. The CDIA developed a credit reporting resource guide for accurately reporting credit.

41. The CDIA's Metro 2 is accepted by all CRAs.

42. The credit reporting accepted industry standards for reporting Metro 2 accurately are found in the CDIA's credit reporting resource guide (CRRG).

43. The CRRG outlines the industry standards for most accurately reporting debts using Metro 2.

44. The three main credit bureaus helped draft the CRRG.

45. The CRRG is not readily available to the public. It can be purchased online for $229.45.

46. Even if a buyer is ready willing and able to pay for the CRRG, the CDIA will NOT grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.

47. When FICO calculates credit scores the algorithms use Metro 2 information based on industry standards established by the CDIA.

48. The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.

49. If the Metro 2 data received by FICO deviates from industry standards an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower a consumer will be considered a higher credit risk resulting in less favorable lending terms.

50. All three major CRAs are members of the CDIA

51. The CDIA is on record that they know, understand, and accept mortgages are generally non-dischargeable under 11 U.S.C. §1328(c)(1) and 11 U.S.C. § 1322(b)(5).

**Consumer Information Indicator**

52. When a consumer files for bankruptcy protection certain credit reporting industry standards exist.

53. Certain Metro 2 data is regularly expected and calculated by FICO when determining a consumer's credit worthiness.

54. The Consumer Information Indicator (CII) is a critical field in the Metro 2 Format that indicates a special condition that applies to a specific consumer.

55. Under Metro 2 the CII must be reported only on the consumer to whom the information applies.

56. It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

57. In the consumer bankruptcy context CII Metro 2 Code "A" denotes that a petition for Chapter 7 has been filed, is active, but no discharge has been entered.

58. CII Metro 2 Code "D" indicates that a Chapter 13 petition has been filed, is active, but no discharge entered. This is usually translated on a consumer credit report as "Wage Earner Plan" or "WEP" in the "Account Status" portion of a trade line. Such reporting alerts any potential lender that the account is no longer in a collectable status but is being handled by a Chapter 13 trustee.

59. The CII Metro 2 Code "Z" indicates that a bankruptcy petition has been filed but the chapter is undesignated/unknown.

60. The CII Metro 2 Code "E" denotes that a Chapter 7 bankruptcy has been discharged.

61. The CII Metro 2 Code "H" denotes that a Chapter 13 bankruptcy has been discharged.

62. The CII field is a critical field for consumers and directly relates to and impacts a consumer's credit worthiness.

63. The result lowers a consumer's credit score and makes a consumer appear much less credit worthy.

**Plaintiff's Dispute**

64. On December 15, 2020 Plaintiff ordered a credit report from Experian, Equifax, and TransUnion to ensure proper reporting by Plaintiff's creditors after his Chapter 7 bankruptcy was completed and discharge was entered.

65. Plaintiff noticed various delinquent and adverse trade lines on his December 15, 2020 credit report. In particular, Wheels Financial was reporting an account as past-due rather than included/discharged in bankruptcy.

66. In response, Plaintiff disputed the Wheels Financial tradeline with Experian, Equifax, and TransUnion via certified mail. The dispute letters were received on January 19, 2021.

67. Plaintiff's dispute of the Wheels Financial account stated that the account was included/discharged in bankruptcy and should not be listed as in collections or past-due.

68. Plaintiff is informed and believes that each CRA received Plaintiff's dispute letter and in response sent Plaintiff's dispute to Wheels Financial via an ACDV through e-OSCAR.

69. On March 16, 2021 after the statutory time period had elapsed for Plaintiff to receive a reinvestigation report from the credit Bureaus, Plaintiff ordered a second credit report from Experian, Equifax, and TransUnion for the sole purpose to ensure Plaintiff's account with Wheels Financial had in fact been updated.

**Inaccuracy – Wheels Financial**

70. Plaintiff was frustrated to see that the Wheels Financial account was not properly updated and instead continued to report Plaintiff's account as being past-due.

71. Wheels Financial did not update Plaintiff's account to indicate that it was included and discharged in bankruptcy – instead continuing to report on Plaintiff's credit report as if no bankruptcy was filed.

72. Such reporting makes it appear that Plaintiff is still obligated to make payments on the Wheels Financial debt and that the account was not included or discharged in bankruptcy.

73. Wheels Financial has not updated the CII to reflect that the account was ever subject to the terms of Plaintiff's Chapter 7 filing nor subsequently discharged.

74. Rather than updated the CII to an "E" Wheels Financial continues to report that the account is past-due, and consequently, appears that Plaintiff still must make payments to Wheels Financial on the account despite the account being discharged.

75. Such reporting remains entirely inaccurate.

**Willfulness**

76. Wheels Financial had actual knowledge of the bankruptcy but refused to update the CII on its tradeline.

77. This was not a negligent act by Wheels Financial but instead an intentional act to purposefully undermine Plaintiff's ability to effectively restore Plaintiff's credit through bankruptcy and attempt to receive payment on the discharged account.

78. Wheels Financial is not following industry standards and is not listing the correct consumer information indicator (CII) as the CII should be updated to an "E" as Plaintiff's bankruptcy has been discharged.

79. By indicating that the account is past-due, without notating the bankruptcy, makes it appears that Plaintiff has filed to address this outstanding account, still owes Wheels Financial, and that the Wheels Financial account was not included/discharged in bankruptcy.

80. By notating the CII-E potential lenders are alerted to the fact that the account has been included and discharged in bankruptcy and that there is no balance owed on the account.

81. Once Wheels Financial received Plaintiff's dispute, rather than acknowledge the bankruptcy filing and subsequent discharge, Wheels Financial continued to report the account as if no bankruptcy had been filed and no discharge had been entered.

82. Wheels Financial did nothing to investigate Plaintiff's dispute nor did it perform any type of due diligence on the account to determine whether its reporting was correct.

83. Wheels Financial's reporting of the outstanding past-due notation is an attempt to have Plaintiff make payments on the accounts in order to remove the derogatory and inaccurate account information.

84. Wheels Financial continued to report the negative and derogatory account after entry of Plaintiff's discharge; this was done to have Plaintiff make a payment on the past-due account.

85. The inaccurate information was updated months after entry of Plaintiff's chapter 7 discharge.

**Damages**

86. As a result of the incorrect reporting, Plaintiff has suffered economic loss, diminished credit, and emotional harm.

87. Wheels Financial's inaccurate reporting has been transmitted to third parties since Plaintiff completed his Chapter 7 case and negatively impacted Plaintiff's ability to obtain and rebuild his credit.

88. Wheels Financial's reporting has diminished Plaintiff's credit score.

89. Plaintiff has been denied extensions of credit as a result of the delinquent Wheels Financial account appearing on his credit report.

90. The actions of Equifax and Wheels Financial as alleged herein are acts in violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

## FIRST CAUSE OF ACTION

(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))
Against Defendants Equifax)

**Equifax – Failure to Assure Credit Reporting Accuracy.**

91. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

92. Equifax violated 15 U.S.C. § 1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and credit files it published and maintained concerning Plaintiff.

93. Had Equifax maintained reasonable procedures to assure maximum accuracy Experian and Equifax would never have allowed Defendant Wheels Financial to report the account as described herein.

94. Wheels Financial is not reporting the bankruptcy whatsoever.

95. Similarly, Equifax is reporting that Plaintiff received a discharge, so it should know that Wheels Financial's tradeline is incorrect as a balance cannot be owed on a discharged debt.

96. Even assuming the CRAs are not sophisticated enough to address this obvious contradiction, Plaintiff disputed the account and the CRAs still did not fix the issue.

97. Plaintiff's dispute informed Equifax that the Wheels Financial account was discharged.

98. Instead, the account remains unchanged.

99. As a result of Equifax's violation of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: diminished credit, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**Willfulness**

100. The violations described herein by Equifax were willful, specifically the Credit Bureaus have intentionally and purposefully set up a system where inaccuracies are not only probable but inevitable.

101. In 2012 the FTC reported that 1 in 5 consumer credit reports contains a material error.

102. Such a finding should shock the conscience.

103. When those errors are disputed Equifax, TransUnion, and Experian intentionally send consumer disputes to employees who do not live within the continental United States.

104. This is intentionally done to hide and or subvert a consumer's ability to confront individual directly responsible for approving accurate reporting.

105. Such a policy also inevitably leads to disputes going unresolved as these employees for Defendant Equifax receive little to no training concerning how to accurately report consumer debt.

106. Instead, these employees are simply instructed to parrot whatever information a data furnisher provides regardless of whether or not that information is accurate. *See Saez v. Trans Union,* LLC, 621 F. Supp. 2d 1074, 1083, 1088 (D.Or. 2007); *Grigoryan v. Experian Info. Sols*., Inc., 84 F. Supp. 3d 1044, 1091 (C.D. Cal. 2014); *Haykuhi Avetisyan v. Experian Info Sols*., No. CV 14-05276-AB (ASX)

107. Equifax employees are regularly expected to review and approve over 90 disputes per day rendering less than five minutes to review, investigate, and respond to each dispute received.

108. Equifax has intentionally setup this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

109. Equifax also allowed Wheels Financial to report the account with inaccurate information despite specifically being told in the dispute letter why the information Wheels Financial was reporting was incorrect.

110. Equifax is a member of the consumer data industry association

111. Despite Equifax having actual knowledge of Plaintiff's bankruptcy, Equifax allowed Wheels Financial to continue reporting the account as past-due, with no reference to the bankruptcy filing or discharge.

112. Equifax is allowing Wheels Financial to report in a manner that they know is factually impossible (an account cannot be past-due if the bankruptcy discharge has been entered.

113. As a result, Equifax is allowing Wheels Financial to report in a manner they know is factually and legally inaccurate.

114. Consequently, Defendant Equifax is liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.

115. In the alternative, Equifax was at least negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

116. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## SECOND CAUSE OF ACTION

(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681s-2(b))
Against All Defendants)

**Wheels Financial – Failure to Reinvestigate.**

117. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

118. 15 USC 1681s-2(b) and 15 USC 1681i-(a)1 prohibits furnishers from providing any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate or misleading and requires a furnisher to update and or correct inaccurate information after being notified by a consumer reporting agency of a dispute by a consumer.

119. Defendant Wheels Financial violated section 1681s-2(b) by failing to conduct a reasonable investigation and re-reporting misleading and inaccurate account information.

120. The CRAs provided notice to Wheels Financial that Plaintiff was disputing the inaccurate and misleading information, but Wheels Financial failed to conduct a reasonable investigation of the information as required by the FCRA.

121. Based on Plaintiff's dispute, Wheels Financial should have known that its reporting was incomplete as Plaintiff's dispute letters highlighted the problems with the tradeline.

122. The most basic investigation would simply involve reading Plaintiff's dispute letters.

123. Plaintiff alleges Wheels Financial did not review well established industry standards for credit reporting.

124. If Wheels Financial had reviewed such standards, Wheels Financial would have seen its reporting was not in compliance and in accordance with the CRRG and consequently inaccurate and or incomplete.

125. Had Wheels Financial done any type of investigation in response to Plaintiff's dispute Wheels Financial would have realized its account was included in bankruptcy and discharged, so no balance/past-due balance/or other delinquent notation should have been reported.

126. The lack of investigation is unreasonable.

127. Plaintiff further alleges that Wheels Financial have not properly trained those directly investigating disputes on Metro 2 generally or credit reporting industry standards and as such have developed reckless policies and procedures.

**Equifax – Failure to Reinvestigate Disputed Information.**

128. Plaintiff re-alleges and incorporates herein the allegations in each and every paragraph above as though fully set forth herein.

129. After Plaintiff disputed the account mentioned above, Experian, TransUnion, and Equifax were required to conduct a reasonable

investigation and to delete any information that was not accurate under 15 USC 1681i-(a)1.

130. Equifax failed to conduct a reasonable investigation and failed to correct the misleading and or inaccurate statements on the account within the statutory time frame or at all.

131. Equifax could not have possibly done any type of reasonable investigation into this matter as Plaintiff specifically explained that the Wheels Financial account was discharged in his bankruptcy.

132. Plaintiff alleges that Equifax have its own independent duty to conduct a reasonable investigation 15 USC 1681i-(a)1.

133. Equifax are not passive entities bound to report whatever information a DF provides.

134. Given the aforementioned, Plaintiff allege that Equifax can and does suppress inaccurate information from being reported when DFs provide inaccurate information.

135. Equifax can and does instruct DFs on how to properly report certain accounts from time to time upon request from the DF.

136. Equifax failed to conduct a reasonable investigation because any basic investigation would have included a review of Plaintiff's dispute letters.

137. Equifax therefore did not do the most basic investigation regarding credit reporting industry standards otherwise the aforementioned would have been uncovered.

138. Equifax intentionally, willfully or with reckless disregard for Plaintiff's accuracy did no investigation whatsoever given that Equifax's general policy is to simply parrot whatever information a data furnisher sends.

139. Such policies and procedures inherently lead to inaccurate information being reported and therefore such an investigation is wholly unreasonably and reckless i.e. willful.

**THIRD CAUSE OF ACTION**
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))
Against Defendant Equifax)

**Equifax – Failure to Review and Consider All Relevant Information.**

140. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

141. Equifax violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

142. As a result of Equifax's violation of 15 U.S.C. § 1681i(a)(4), Plaintiff suffered actual damages, including but not limited to, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

143. The violations by Equifax were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

144. In the alternative Equifax was negligent, which entitle Plaintiff to recovery under 15 U.S.C. § 1681o.

145. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**FOURTH CAUSE OF ACTION**
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))
Against Defendant Equifax)

**Equifax– Failure to Delete Disputed and Inaccurate Information.**

146. Plaintiff re-alleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

147. Equifax violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

148. As a result of Equifax's violation of 15 U.S.C. § 1681i(a)(5)(A), Plaintiff suffered actual damages, including but not limited to, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

149. The violations by Equifax were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

150. In the alternative, Equifax was negligent, which entitle Plaintiff to recovery under 15 U.S.C. § 1681o.

151. Plaintiff are entitled to recover actual damages, statutory damages, costs and attorney's fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## FIFTH CAUSE OF ACTION

(Violation of California Consumer Credit Reporting Agencies Act California Civil Code § 1785.25(a) Against Defendant Wheels Financial)

**Wheels Financial – Reporting Inaccurate Information to CRAs.**

152. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

153. In the regular course of its business operations, Wheels Financial routinely furnish information to credit reporting agencies pertaining to transactions between Defendants and Defendant's consumers, so as to provide information to a consumer's credit worthiness, credit standing and credit capacity.

154. Wheels Financial intentionally and knowingly reported misleading and inaccurate account information to the CRAs that did not follow with well-established industry standards.

155. Plaintiff alleges that Wheels Financial re-reported the information contained herein in violation of California Civil Code § 1785.25(a).

156. Plaintiff also alleges that Wheels Financial all had reason to know that the information reported on Plaintiff's account was misleading, inaccurate, and incomplete.

157. Plaintiff alleges that Wheels Financial all had reason to know that by not complying with well-established industry standards lenders will draw a more negative inference with respect to Plaintiff's credit worthiness.

158. Plaintiff alleges that the dispute letters from all three credit reporting agencies, the consumer data industry resource guide, and results of its investigation should have provided notice to Wheels Financial of its misleading and inaccurate reporting.

159. Wheels Financial failed to notify Equifax that the information Defendant Wheels Financial re-reported was inaccurate before the end of 30 business days, in violation of California Civil Code § 1785.25(a).

160. Wheels Financial's communications of false information, and repeated failures to investigate, and correct its inaccurate information and erroneous reporting were done knowingly, intentionally, and in reckless disregard for their duties and Plaintiff's rights.

161. As a direct and proximate result of Wheels Financial's willful and untrue communications, Plaintiff has suffered actual damages including but not limited to reviewing credit reports from all three consumer reporting agencies, time reviewing reports with counsel, sending demand letters, diminished credit score, denial of credit, and such further expenses in an amount to be determined at trial.

**SIXTH CAUSE OF ACTION**

(Breach of Contract)

(Against Defendant Wheel's Financial)

162. Plaintiff realleges and incorporates herein the allegations in each and every paragraph above as though fully set forth herein.

163. Defendant entered into an agreement with Plaintiff regarding Plaintiff's vehicle loan on or about July 15, 2020.

164. Among other things, Defendant agreed to report the account as settled to the credit reporting agencies.

165. Plaintiff performed on his obligations under the July 15, 2020 agreement.

166. Defendant breached the terms of the July 15, 2020 agreement by failing to report to the credit reporting agencies that Plaintiff's account was settled, and instead reported that the account as past-due.

167. Defendant did not update the tradeline even after Plaintiff disputed the account.

168. As of January 2021, nearly eight months after the agreement was signed, Defendant confirmed that the past-due notation was correct.

169. Implicit in the settlement agreement and release is a covenant of good faith and fair dealing, obligating the parties to act towards each other in good faith, to deal fairly with one another, to make all material disclosures, and not to do anything which might deprive the other of the expectations and benefits of the settlement agreement and release.

170. As a direct and proximate result of Defendant's breach as described herein, Plaintiff has been damaged in an amount to confirm to proof at a hearing, which includes actual damages, including attorney's fees and costs.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

1. For preliminary and permanent injunctive relief to stop Defendants

from engaging in the conduct described above;

2. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n and California Civil Code § 1785.31;
3. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n; and California Civil Code § 1785.31
4. Award attorney's fees and costs of suit incurred herein pursuant to 15 U.S.C. § 1681n & o; California Civil Code § 1785.31;
5. For determination by the Court that Creditor's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, et seq.; and
6. For determination by the Court that Creditor's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

**Gale, Angelo, Johnson, & Pruett, P.C.**

Dated: May 5, 2021 */s/ Joe Angelo*
Joe Angelo
Elliot Gale
Attorneys for Plaintiff

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand trial of this matter by jury.

**Gale, Angelo, Johnson, & Pruett, P.C.**

Dated: May 5, 2021 */s/ Joe Angelo*
Joe Angelo
Elliot Gale
Attorneys for Plaintiff